31421. GAINESVILLE MIDLAND RAILROAD CO. *v.*
FLOYD, administratrix.

DECIDED NOVEMBER 7, 1946. REHEARING DENIED DECEMBER 4, 1946.

*Dunlap & Dunlap, William P. Whelchel, Orrin Roberts,* for plaintiff in error.

*A. M. Kelly, B. F. Whelchel,* contra.

FELTON, J. ■ According to the evidence the accident resulting in the death of the plaintiff's husband occurred during a switching operation at Monroe, Georgia, on January 8, 1945, at approximately 7:30 p.m., which was a dark evening. The tracks upon which the accident occurred and the switching operation was being performed run in a northerly and southerly direction, with the transfer, side, and spur tracks to the west of the main Gainesville Mid-

land line and the switch permitting passage from the main track to the transfer and other tracks located some few feet south of Church Street, a thoroughfare of the City of Monroe, crossing the railroad tracks of the Gainesville Midland line. There is some evidence that there were bright lights at this crossing, though the night was dark. It appears that the engine of the defendant railroad was headed in a northerly direction with two boxcars attached to the front of the engine. Two other cars, a boxcar and a gondola car filled with sand were sitting upon the sidetrack, the gondola car being north of the boxcar. According to all members of the train crew, Floyd, the conductor, gave verbal instructions that the engine with the boxcars attached to the front of it was to enter this track, pick up the boxcar and gondola car by coupling them to the two boxcars already attached to the engine, and proceed north onto the main line north across Church Street, at which point the engine would be cut loose from the *four* cars and move south, back along the main line and out of the way of the four cars north of Church Street, in order to permit the *four* cars to drift back across Church Street, and enter the transfer track by force of gravity, the main line north across Church Street being slightly upgrade. The engine would then return south to a switch and enter the transfer track, push the four cars onto the spur track, connecting with the transfer track, to a point in front of the Nunnally Lumber Company, and place the two northernmost cars, namely, the boxcar and gondola car attached to it, in front of the Nunnally Lumber Company. Floyd was operating the switch permitting the cars to pass from the main line into the transfer track and flagging Church Street as the engine and cars crossed and recrossed the thoroughfare. There is no evidence in the record that Floyd, who was in full charge of the operation of switching and placing the cars, at any time countermanded these original instructions. In fact each member of the crew testified positively that he did not alter his instructions. His orders, so far as the record shows, were apparently followed, up to the point where the engine with the four cars attached was proceeding across Church Street. At this point the engineer testified that Floyd signalled him to "kick" the cars, which according to the engineer's interpretation of the word meant to speed up the train suddenly, thereby removing any tension between the cars, which would permit a person to remove the coupling

pin and separate the cars. The engineer did not testify, however, that following the kick signal Floyd actually "cut" the cars into pairs, but testified that he merely went out of sight following the kick signal and upon returning signalled him, the engineer, to proceed north across Church Street, which he did, and having crossed Church Street, Floyd separated the engine from the cars and signalled the engineer to proceed southward, back along the main line in order to permit the cars to enter the transfer track. The evidence shows that two of the cars with a brakeman on the leading, or southernmost, car then drifted down the main line south into the transfer track, followed by the other two cars, with a brakeman located on the trailing car or northernmost car, this being the gondola car with the boxcar between the brakeman and the transfer track. The *four* cars did not proceed together as a group but in pairs. Wiley Cronic, an employee of the railroad who was off duty, but had ridden the train from the depot, as the switching operation would take him near his home, testified that, when he left the train just north of Church Street and the cars had begun to drift back southward, he observed that the four cars were not coupled together as a group, and warned the brakeman on the two northernmost cars to apply the brakes and stop the cars. He did not inform the brakeman that the cars were separated, but merely called to him and signalled to him "to hold it." The brakeman replied that the conductor, Mr. Floyd, had ordered all four of the cars to go into the transfer track; and the witness Cronic made no further protest to the brakeman. These last two cars did not, however, enter the transfer track, but drifted south back along the main line, where at some point south of Church Street they ran upon and crushed out the life of Floyd, who, the jury, under the circumstances, was authorized to find, had taken it for granted that the four cars had gone onto the transfer track. According to the witness Cronic, there was a distance of about 40 feet between the two sets of cars as they drifted south, and nowhere does it appear that Floyd at any time gave instruction other than that the four cars should proceed into the transfer track as a group of four. He at no time, so far as the record shows, instructed that the cars were to proceed in pairs into the transfer track, or that one set of two cars would enter the transfer track while the other set should return southward along the main track. It is undisputed that the four

cars were not coupled together when they returned southward by force of gravity, and the question whether this was the result of the negligence of the other employees in failing to couple the cars properly—and one of the brakemen testified that he had known occasions when the coupling pin failed to drop into its slot, thereby leaving the cars uncoupled—or was the result of Floyd's having changed his mind and separated the cars into pairs himself, and what was the proximate cause of Mr. Floyd's death, were questions for the jury, as was the question of whether Floyd was, under the circumstances, in the exercise of ordinary care. The jury resolved these questions in favor of the plaintiff, and we can not say as a matter of law that under the facts and circumstances of the case the defendant was not negligent, or that Floyd met his death from a failure to exercise ordinary care, or that he could have avoided the negligence of the defendant by the exercise of ordinary care. There was sufficient evidence to authorize the finding of the jury, and the court did not err in overruling the motion for a new trial on the general grounds.

The defendant contends further that the court erred in charging the jury as follows: "In all actions brought against any common carrier by railroad to recover damages for personal injuries to any employee, or when such injuries have resulted in death, the fact that the employee has been guilty of contributory negligence not amounting to a failure to exercise ordinary care, shall not bar a recovery, but the damage shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. In all actions brought against a common carrier by railroad to recover damages for injuries to or the death of an employee, the fact the employee may be guilty of contributing negligence, as I have stated, will not bar a recovery unless the contributory negligence of the employee amounts to a failure to exercise ordinary care for his own safety. If you find both the plaintiff's husband and the defendant's employees were equally at fault, there could be no recovery. If you find that the plaintiff's husband was more at fault than the defendant's employees, there can be no recovery. If you find the plaintiff's husband was negligent, but the negligence of the defendant's employees was greater, a recovery may be had but, as I have stated, the damages shall be diminished by the jury in proportion to the amount of negligence contributed by the employee.

If you find the death of plaintiff's husband was due to the negligence of the defendant's employees you should find for the plaintiff. If you find that the death of the plaintiff's husband was due solely to his own negligence you will find for the defendants."

Error is assigned by the defendant upon this portion of the court's charge for the following reasons: "1. It is essential to the plaintiff's right to recover on the ground of the negligence of the defendant's servants that the negligence of such servants should be the proximate cause of the plaintiff's husband's death, and not that it is a mere contributing cause thereof. 2. It is essential that the negligence of the defendant's servants and employees must be the chief cause, the preponderating cause, the controlling cause before a recovery may be had. 3. Where both the negligence of the plaintiff's husband and the negligence of the defendant *proximately* caused the death of the plaintiff's husband, there can be no recovery by the plaintiff unless the negligence of the defendant's servants proximately contributing to his death is greater than the negligence of the plaintiff's husband. 4. Where the negligence of the deceased is the proximate cause of his death, and the negligence of the defendant's servants does not proximately contribute to the injury resulting in death, the plaintiff can not recover. 5. That said charge amounted to an instruction that the jury would be authorized to find for the plaintiff, notwithstanding the negligence of the defendant's servants and employees may not have been the proximate cause of the death of the deceased. 6. Because said charge was confusing to the jury and was not corrected or changed or explained elsewhere in said charge, and was harmful to defendant's case, . . and is not a full and correct statement of the law under the evidence in this case. 7. Because said entire charge ignored the fact that any negligence of the defendant must have been the proximate cause or must have proximately contributed thereto before a recovery could be had in any view of the case. 8. Because said charge fails to instruct the jury that, if the plaintiff's husband could have avoided the negligence of the defendant's employees and servants by the use of ordinary care upon his part, if said employees and servants were negligent, in that event the plaintiff could not recover."

The charge was not error requiring the grant of a new trial for any reason assigned. Under the facts of this case, the findings of

the jury as to the negligence of the deceased and the railroad necessarily fixed and determined the proximate cause or causes of the injuries. The injuries were proximately caused either by the negligence of the railroad alone, or by the negligence of the deceased alone, or by the combined negligence of both. If the deceased alone was negligent, his negligence was necessarily the proximate cause of his death. If the railroad alone was negligent, its negligence was necessarily the proximate cause of the death. If both the deceased and the railroad were negligent, the combined negligence of both was the proximate cause of the death, and the question of liability turned on the degrees of care exercised by the respective parties. This is not a case where an intervening cause can be said to have proximately caused the death, nor one where there can be any other conclusion but that, if the deceased or the railroad was negligent, or if they were both negligent, such negligence was the sole proximate cause or the contributing proximate causes of the death. This being true, the court did not err in omitting from his charge the principle as to proximate cause. The charge was a thorough and correct guide by which the jury could fix liability in this case.

The eighth point of the exception is without merit for the reason that the court charged the jury that they should find for the defendant if they believed that the death was due to the deceased's own fault or that he could have avoided his injuries and death by the exercise of ordinary care.

■ The railroad contends that a verdict in its favor was demanded, for the reason that the burden of proof was on the plaintiff, and that the evidence equally supported two inconsistent inferences. This rule applies only to cases where the evidence is uncontradicted. It does not apply in cases where the two inconsistent theories are based on contradictory testimony or circumstances, or both. In such cases the jury must decide between the two theories, and when it does there is in fact but one theory. It is only where the evidence is not in conflict that the jury is faced with two theories. In this case we think that the testimony that Floyd gave the kick signal, and walked between the cars and thereafter stepped onto the track in front of the last two cars, is so inconsistent with his plan to have all four cars go into the side track coupled together that the jury was authorized to disbelieve the

testimony relating to the giving of the kick signal, etc. If this testimony was rejected, there remained only one theory and that was that the death was not caused by Floyd's uncoupling the sets of cars and stepping in front of two of them. In this connection, see *Detwiler* v. *Cox,* 120 *Ga.* 638 (48 S. E. 142) ; *Southern Ry. Co.* v. *Newman,* 187 *Ga.* 132 (199 S. E. 753).

For the foregoing reasons the court did not err in overruling the motion for a new trial.

*Judgment affirmed. Sutton, P. J., and Parker, J., concur.*